**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| FRANCISCO PERALTA, | Plaintiff, | DECISION AND ORDER |
| Vs. | | |
| VIRGINIA BLUFF,[1] | Defendant. | 04-CV-6559-CJS-JWF |

---

**APPEARANCES**

For Plaintiff:   Brian Laudadio, Esq.
Joseph S. Nacca, Esq.
Bond Schoeneck & King PLLC
350 Linden Oaks Suite 310
Rochester, NY 14625
(585) 362-4714

For Defendant:   Gary M. Levine, A.A.G.
New York State Office of the Attorney General
144 Exchange Boulevard, Suite 200
Rochester, NY 14614
(585) 327-3223

**INTRODUCTION**

**Siragusa, J.** This prisoner civil rights case is before the Court on Defendant's application for summary judgment, filed April 8, 2014, ECF No. 60. The Court heard oral argument on June 19, 2014, and reopened discovery for the limited purpose of determining the identity of the individual who allegedly administered a double dose of Kayexalate to Plaintiff. Despite the commendable assistance provided to Plaintiff by *pro bono* counsel, the Court determines that Defendant's motion should be granted.

---

[1] This case was previously titled *Peralta v. Donnelly*, and named five defendants. Donnelly was terminated in 2007, and the John and Jane Doe defendants were terminated in 2012. Consequently, the Clerk is directed to conform the docket to the caption listed above.

## FACTUAL BACKGROUND

Both parties complied with L.R. Civ. P. 56, filing a statement of undisputed facts, and an opposing statement. The following facts are taken from the unopposed portions of Defendant's statement.[2]

In her statement of facts, defendant Virginia Bluff ("Bluff"), a Caucasian female, maintains that she was a Physician's Assistant licensed to practice in the State of New York since March 5, 1982 and employed by the New York State Department of Correctional and Community Services ("DOCCS"). In 2003, Bluff worked as a Physician's Assistant at the Regional Medical Unit at Wende Correctional Facility where Peralta Francisco Peralta ("Peralta") was an inmate. Peralta had been incarcerated in DOCCS since 1996. Peralta was a forty-three year old man with diabetes, hypertension and end stage renal disease. He was receiving hemodialysis three times a week.

In March 2003, Peralta received dialysis at Wende Correctional Facility. Peralta knew Bluff and had no problems with her. On March 5, 2003, Peralta complained to a nurse that he was not feeling well. Peralta's blood was taken and it was reported to Bluff that Peralta had an elevated potassium level of 6.4, instead of the normal level between 3.3 and 5.3. The following day, March 6, 2003, Bluff repeated the laboratory study to confirm the high potassium level. Also on March 6, 2003, while she was on sick call rounds, Bluff was advised over the telephone that Peralta still had a high potassium level of 6.2. High potassium levels may cause heart problems which may be fatal. As a

---

[2] In some instances, Plaintiff responded that he lacked the knowledge or information sufficient to admit the allegation, or deny it. In those instances, the Court has adopted Defendant's statement.

result of the high potassium levels, Bluff prescribed Kayexalate, 30 gm po bid[3] to address Peralta's high potassium level.

Kayexalate is a medicine commonly prescribed to patients that show elevated potassium levels. Prior to March 2003, Peralta had used Kayexalate without any complications. Kayexalate is given in liquid form from bottles-normally one bottle at a time. Peralta did not have any further problems until the end of March, 2003. Peralta states that on March 29, 2003, at around 8:00 a.m., he was given a double dose (two bottles) of Kayexalate before his dialysis treatment by a "small frame African American Nurse" Second Amended Compl. ¶ 13, Sept. 10, 2007, ECF No. 22; Peralta Dep. at 16, 24, & 27, Dec. 13, 2013, ECF No. 60-2 (attached as Ex. A to Levine Decl., Apr. 8, 2014, ECF No. 60-2). Bluff did not administer medicine to patients. Peralta's medical record had no indication that the Kayexalate dosage was changed. His complaint alleged that the order for the double dose of Kayexalate camefrom Bluff by telephone. Compl. ¶ 13; Peralta Dep. at 27. Peralta did not hear the alleged phone call and has no personal knowledge of the contents of the alleged telephone call. Peralta Dep. at 28. Bluff had no contact with Peralta during the time he received the double dose of Kayexalate. Bluff maintains that she did not order a double dose of Kayexalate on March 29, 2003.

Peralta became sick after taking the extra dose of Kayexalate. The medical records indicate that on March 31, 2003, he was seen by Dr. Miller for complaints of muscle weakness. The records also show that on April 1, 2003, Peralta was seen by Dr. Clemens with increased complaints, and was admitted to Erie County Medical Center ("ECMC") for evaluation. At ECMC, Peralta was treated for hypokalemia (lower-than-normal amount of potassium in the blood) and returned to the facility on April 3, 2003.

---

[3] Meaning by mouth, twice per day. Bluff Dep. 48:6–9, Dec. 13, 2013, ECF No. 60-2.

The hospital discharge memorandum stated: "Muscle weak and myalgias secondary to hypokalemia most likely from the aggressive treatment with Kayexalate." On April 16, 2003, after Peralta returned to the facility, he filed a grievance about Kayexalate. On April 29, 2003, Bluff submitted a memorandum to the grievance department advising them of her role in Peralta's treatment.

Peralta's statement adds the following facts. Peralta is a native of the Dominican Republic who attained an eighth grade education. He is a former inmate of the Wende Correctional Facility in the Town of Alden in Erie County, New York ("Wende"). During the course of his confinement at Wende and earlier, Peralta suffered from kidney failure and had to undergo dialysis treatment. This treatment consisted of the cleaning of his blood three times a week. During the course of this treatment, he was confined at the Wende infirmary and not housed in the general population. He was simultaneously receiving medication for diabetes and high blood pressure. He was not aware of any other medical conditions for which he might have been receiving treatment.

Regarding the events of March 29, 2003, at around 8:00 a.m., Peralta was administered Kayexalate medication prior to his dialysis treatment. On March 29th, he was given a double dose of Kayexalate, rather than the single dose usually administered to him. Peralta contends that Bluff gave the order to administer the double dose of Kayexalate via telephone. At this time, he was confined in the infirmary. Approximately three hours later, he was taken to dialysis treatment. About an hour and a half after starting dialysis, he requested some water. A white male nurse, about 30 years old, who had a large build and stood approximately six feet tall, brought him a large cup of ice water. He handed Peralta the cup, at which time Peralta realized that he

4

had no strength in his right hand to hold the cup. As a result, the cup fell and the water spilled all over him. At this point the nurse asked what happened. Peralta explained that he had no strength in his hand. Within minutes the situation worsened, as he began losing all of the strength throughout his body. A supervisor was called, and Peralta told him that he believed he was reacting poorly to the medication. At this point, he could not stand up and had no strength in his arms, legs or hands. He finished his dialysis and was taken to his room in a wheelchair. During the course of that evening and throughout the night, he repeatedly complained of muscular weakness and breathing difficulties. In spite of his complaints, nothing was done. He continued complaining of muscular weakness and difficulty breathing through the following morning of March 30, 2003, and thereafter, until, eventually, he was seen by a short, heavy set, African American doctor who wore glasses. This doctor immediately sent him to ECMC. Despite Peralta's repeated complaints, he was not admitted to ECMC until April 1, 2003. Once admitted, he spent the night of April 1 and the following two to three days at ECMC. Upon being returned to the Wende facility, he was informed by the dialysis supervisor at Wende that the double dose of Kayexalate was the cause of his severe medical problems.

Peralta contends that despite being the medical professional who prescribed Kayaxelate to Peralta, and despite knowing that Kayexalate is known to weaken muscles, Bluff failed to follow up with Plaintiff or take any affirmative action to assess whether Peralta was tolerating the Kayexalate without harm. Peralta further contends that this failure led to permanent damage, which could have been avoided had he been monitored.

At ECMC, Peralta was diagnosed with Myalgia and muscle weakness. Upon information and belief, Peralta asserts that he has suffered the following permanent physical damage as a result of Bluff's alleged deliberate indifference in allegedly ordering a double dose of Kayexalate and by allegedly failing to properly monitor his reaction and/or failing to immediately send him to the hospital despite his repeated complaints about his reaction to the medication: 1) wasting of the muscles in the arches of both feet; 2) wasting of the muscles in the upper leg of both legs; 3) weakening of both knee joints; 4) wasting of the muscles in his right hand, lower and upper right arms; 5) damage to the heart, which has required him to take four different heart medications ever since; 6) systemic "pins and needles"; and 7) random nervous jerks of the body. Peralta made diligent efforts to learn the identities of Bluff and additional caregivers throughout this litigation, and acted *pro se* in this matter until he was appointed counsel on March 21, 2011.

## STANDARD OF LAW

*Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden

of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert. denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1)(B). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## ANALYSIS

### *Statute of Limitations*

As a preliminary matter, Bluff asks the Court to revisit its earlier decision on the statute of limitations. Def. Mem. of Law at 4–5. In its Decision and Order, the Court wrote:

> Section 1983 claims are governed by a three-year statute of limitations. Defendant alleges that Plaintiff knew of her identity in 2003 and did not file

7

> a complaint until 2007, which is beyond the three year statute of limitations. For proof of this, Defendant provided the Court with a copy of her response to Plaintiff's grievance from Wende Correctional Facility. However, Defendant fails to prove that Plaintiff actually received a copy of this document prior to 2006. Accordingly, Defendant's motion that the claim should be dismissed based on the statute of limitations is denied.

*Peralta v. Bluff*, No. 04-CV-6559, 2012 U.S. Dist. LEXIS 168168, 11–12 (W.D.N.Y. Nov. 26, 2012). Bluff states that she has now provided the Court with evidence that she prescribed Kayexalate to Peralta and that he had knowledge of that in 2003. Bluff refers to Peralta's deposition transcript pages 35–37. The questioning at that point in the deposition referred to Peralta's April 16, 2003, grievance, and to papers in an Exhibit 2, which apparently contained Bluff's memo to the Inmate Grievance Review Committee ("IGRC"). Peralta was asked if he saw that memorandum in 2003, to which he responded, "Yes, sir." Peralta Dep. 35:24–25. However, shortly after that response, Peralta was examined by his counsel and asked the following questions, to which he gave the following responses:

> Q. When did you receive if you want to look back at that page, the memo from Ms. Bluff? When did you receive that document, do you remember?
>
> A. No. I no remember. My mind is not clear. I know I receive, but I don't remember exactly what day they give to me.
>
> Q. Did you receive it within a couple of months of the incident or did you receive it several months later, do you remember?
>
> A. Couple of months after the problem. Couple—I no remember how many months, but after this—I don't remember. They gave some envelope in prison a couple of months later. . . .
>
> MR. NACCA: For the record the witness is pointing to the handwriting on the page.
>
> A. Yes, sir.
>
> Q. Was that handwriting on the document when you had received it?
>
> A. Yes, sir.

8

Peralta Dep. 38:11–39:2, 39:12–18. The handwriting on Bluff's April 29, 2003, memo to the IGRC is as follows:

> To—IGRC
>
> From—Me.
>
> [Illegible] F. Peralta– 96-A-6821 Grievance dated 4-18-03
>
> I read the grievance, reviewed the medical record and discussed the case with staff. The process of reviewing lab work is being reviewed and recommendations have been made.

Bluff Memo, Apr. 29, 2003, ECF 60-2 (page 68 of 163 pages). Bluff's evidence fails to support her contention. Peralta' deposition testimony, whether because of his limited English abilities, or his memory, or the passage of time between the incident and the date of the deposition, does not show to the Court's satisfaction that he knew of Bluff's involvement in 2003. Consequently, the Court sees no reason to revisit its prior decision on the statute of limitations.

### *Eighth Amendment Claim*

Peralta is suing pursuant to 42 U.S.C. § 1983 alleging that Bluff exhibited a deliberate indifference to Peralta's serious medical need, contrary to the Eighth Amendment prohibition against cruel and unusual punishment. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d. Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).

To show that prison medical treatment was so inadequate as to amount to "cruel or unusual punishment" prohibited by the Eighth Amendment, a plaintiff must prove that

the defendant's actions or omissions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

As the Supreme Court explained in *Wilson v. Seiter*, 501 U.S. 294, 298-99, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991), this standard includes both an objective and a subjective component. With respect to the objective component, a court must ask whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights. With respect to the subjective component, a court must consider whether the deprivation was brought about by the defendant in wanton disregard of those rights. *Id*. Therefore, to establish deliberate indifference, a plaintiff must prove that the defendant had a culpable state of mind and intended to wantonly inflict pain. *See Wilson*, 501 U.S. at 299; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992), *aff'd*, 970 F.2d 896 (2d Cir. 1992).

In *Estelle*, the Court cautioned that mere negligence is not actionable. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind," *id*. at 102, or "incompatible with the evolving standards of decency that mark the progress of a

maturing society." *Id.* at 105-06. Allegations of medical malpractice do not state a constitutional claim. *Id.*, 429 U.S. at 106 and n.14; *Chance*, 143 F.3d at 703-04; Ross, 784 F. Supp. at 44.

Peralta argues in his memorandum in opposition to the motion that despite being aware of his increasing loss of muscular function, "none of the medical staff at Wende, including Bluff, took any action to assist or otherwise address Peralta's increasingly dire situation." Pl.'s Mem. of Law at 2, May 16, 2014, ECF No. 65. Peralta contends that material issues of fact concerning "whether Bluff's knowledge of the dangers of Kayexalate, coupled with her failure to monitor Peralta after prescribing him Kayexalate, constituted deliberate indifference." *Id.* at 3. Peralta points to Bluff's declaration where she stated, "[m]uscle weakness is a known side effect of Kayexalate." Bluff Decl. ¶ 8, Mar. 5, 2012, ECF No. 42-2. Peralta also points out Bluff's deposition testimony in which she was asked the following questions and gave the following responses:

> Q. [by Peralta's counsel] Did you consider whether any of Mr. Peralta's medical conditions may cause him to react adversely to the Kayexalate?
>
> A. Well, we always consider the whole patient when we order a medication. And there's no way of predicting what adverse effect a patient is going to have in most cases.
>
> Q. Okay. So you did consider his medical condition when making the prescription?
>
> A. Yes. Definitely.
>
> Q. Okay. And in doing that, did you take any consideration as to whether Kayexalate carried with it a risk of reacting adversely to any of Mr. Peralta's medical conditions?
>
> A. Yes. . . .
>
> Q. [by Bluff's counsel] Okay. Why is it important to treat an elevated potassium level in a person like Mr. Peralta?

> A. Because he did have a history of some cardiac disease. But any elevated potassium level can cause a dysrhythmia of the heart function. It can cause rapid rates, slow rates. It can cause severe problems with that.

Bluff Dep. 81:8–82:14.

However, as Peralta admits, he had been treated with Kayexalate in the past with no adverse effects. Peralta Dep. 19:8–17, Dec. 13, 2013, ECF No. 60-2. Peralta's evidentiary proof before the Court on this motion fails to meet his burden to show that Bluff had a culpable state of mind and intended wantonly to inflict pain on Peralta. What the evidence does show is that one or more of the medical staff failed to recognize Peralta's escalating muscle weakness as a side effect of an overdose of Kayexalate. However, nothing before the Court shows that Bluff intended to overdose Peralta in order to cause him muscle failure or pain. Therefore, Peralta has failed to raise a material issue of fact precluding summary judgment, and Bluff has shown that Peralta will be unable to prove deliberate indifference.

## CONCLUSION

For the reasons stated above, defendant Bluff's motion for summary judgment, ECF No. 60, is granted. The Clerk is directed to conform the caption of this case to the caption on this Decision and Order, to enter judgment for defendant Bluff, and to close this case. The Court extends its gratitude to *pro bono* counsel for accepting this difficult assignment. The outcome is not reflective of any failure on the part of *pro bono* counsel, but is, instead, a result of the lack of evidence available to prove Plaintiff's claim.

DATED: February 27, 2015
Rochester, New York

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge